J. Walter Sinclair, ISB No. 2243
*Email: jwsinclair@stoel.com*
Mark S. Geston, ISB No. 1346
*Email: msgeston@stoel.com*
STOEL RIVES LLP
101 S Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: (208) 389-9000
Facsimile: (208) 389-9040

Richard E. Gardiner (Admitted *Pro Hac Vice*)
*Email: regardiner@cox.net*
Suite 404
10560 Main Street
Fairfax, VA 22030
Telephone: (703) 352-7276
Facsimile: (703) 359-0938

Attorneys for Petitioner

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RED'S TRADING POST, INC., | Case No. 07-090-EJL |
| Petitioner, | **PETITIONER'S POST-HEARING BRIEF** |
| v. | |
| RICHARD VAN LOAN, Director of Industry Operations, Bureau of Alcohol, Tobacco, Firearms and Explosives, | |
| Respondent. | |

## I. INTRODUCTION

Petitioner Red's Trading Post, Inc. ("Red's") is a family-owned Idaho corporation that has done business in Twin Falls, Idaho for three generations. Throughout its history, its income has been primarily derived from buying and selling firearms. As such, Red's has maintained a federal firearms license issued under the authority of the federal Gun Control Act, 18 U.S.C. § 923.

**PETITIONER'S POST-HEARING BRIEF - 1**

Under 18 U.S.C. § 923(g)(1)(B), inspectors of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") are authorized to inspect licensees' inventory and records annually to determine whether they are conducting their business in conformity with the Gun Control Act and the regulations promulgated under its authority.  In 2000, ATF inspectors inspected Red's and found a number of violations, including unaccounted for firearms and erroneous record-keeping. Red's met with the ATF afterward and discussed how its practices might be improved.  Hearing Transcript ("HT") 210.  As a result, changes were made in the way Red's did business.  In May 2001, Red's was again inspected.  HT 210.  Out of some 1,400 Forms 4473 inspected, the inspector found only two separate errors in the preparation of two Forms 4473; 1,398 out of 1,400 forms were perfectly completed.  HT 211.  In his report, the inspector stated: "They have established procedures to ensure Forms 4473 are completed correctly."  HT 212.  The inspector also found that no firearms were missing, and that all the A&D records were accurately and completely completed.  HT 211.   The inspector recommended no further action be taken.  HT 211.

The next inspection occurred in June 2005, and a number of purported violations were identified.  All of these violations consisted of omissions or mistakes in record-keeping.  None of the violations involved unaccounted for firearms or unauthorized transfers of firearms to or from parties not entitled to possess them.  It is these violations which form the basis of the present litigation.  To put the current purported violations in perspective, it is important to realize that Red's engages in approximately 1,000 over-the-counter transfers per year and another roughly 1,000 transactions per year in online sales, *i.e.*, firearms are sold online to individuals in another state and transferred to a licensee in that state for physical transfer to the buyer, for a total of about 2,000 transactions per year.  HT 184-185.  Each of the approximately 1,000 annual over the

counter transfers requires the preparation of a Form 4473.

Based upon the June 2005 inspection, Respondent, Director of Industry Operations for ATF with jurisdiction over Red's, sent Red's a Notice of Revocation of its federal firearms license, dated February 2, 2006. Pursuant to 18 U.S.C. § 923(f)(2), an administrative hearing was conducted by ATF on August 8, 2006. This hearing was an informal proceeding in that the hearing officer was an ATF inspector, testimony was not taken under oath, and Red's was not afforded the power of subpoena to compel the testimony of witnesses or discover evidence.

After the administrative hearing, Respondent decided not to reverse his decision to revoke Red's license and, on December 30, 2006, sent Red's a Final Notice of Denial of Application or Revocation of Firearms License (the "Final Notice of Revocation"). Red's, therefore, commenced the instant litigation for judicial review of the Final Notice of Revocation on February 23, 2007, pursuant to 18 U.S.C. §923(f)(3). As specified by statute, this Court now reviews Respondent's license revocation *de novo* and the parties are, pursuant to 18 U.S.C. § 923(f)(3), permitted to present the court with any additional relevant evidence that was not introduced in the administrative hearing.[1] Because this matter is reviewed by the court *de novo*, the court "'need not accord any particular weight to the [ATF's] findings and decision.'" *General Store, Inc. v.*

---

[1] At the trial in this court, the Government attempted (over Red's objection) to introduce evidence of alleged violations which were not set forth in the written notice initially given to Red's (the Notice of Revocation). Because these alleged violations were not set forth in the Notice of Revocation, they were not at issue in the administrative hearing required by 18 U.S.C. § 923(f)(2), and thus are not properly before the court.

18 U.S.C. § 923(f)(1) requires that "any holder of a license which is revoked shall receive a written notice from the Attorney General stating specifically the grounds . . . upon which the license was revoked." § 923(f)(2) requires a hearing to review such revocation, after which § 923(f)(3) requires the Attorney General to decide whether to reverse his decision and authorizes judicial review of the decision if it is not reversed. Accordingly, allowing matters which were not set forth in the written notice required by § 923(f)(1) to be presented to the court directly evades the administrative and judicial review process established by Congress.

**PETITIONER'S POST-HEARING BRIEF - 3**

*Van Loan*, 2007 WL 208425 (E.D. Wash, 2007), at*3. *See also Willingham Sports, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 348 F. Supp. 2d 1299, 1306 (S.D. Ala. 2004), *aff'd* 415 F.3d 1274 (11th Cir. 2005)(*de novo* standard of review "means that the ATF's decision [to revoke a license] is entitled to no presumption of correctness and that the district court may attach such weight, if any, as it deems appropriate to the ATF's determinations and decision").

As reflected by Red's Petition (Dkt. No. 1), Respondent founded his license revocation on 10 different groups of alleged violations of the Gun Control Act and/or the regulations promulgated pursuant to it. Each of these will be addressed in turn below.[2]  Red's will, however, first generally address the issue of whether any of the alleged "violations" of the Act or the regulations were "willful," since violations can only be the basis for revoking a federal firearms license if the Government proves, by a preponderance of the evidence , that they were "willful."

## II.    THE MEANING OF "WILLFULLY"

18 U.S.C. § 923(e) provides in part:

> The Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has <u>willfully</u> violated any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter. (emphasis added).

In *Perri v. Dept. of Treasury, Bureau of Alcohol, Tobacco and Firearms*, 637 F.2d 1332 (9th Cir. 1981) and *Cucchiara v. Sec. of the Treasury*, 652 F.2d 28 (9th Cir. 1981), the court held that § 923(e), which did not then expressly require a willful violation to revoke a license, should be interpreted to include a willfulness element and that, to prove a "willful" violation, the Government had to show that a licensee acted with either purposeful disregard of, or was plainly

---

[2]  Based on Respondent's Motion for Summary Judgment, he has withdrawn the violation described in Count VII of the Petition.

indifferent to, his legal obligations.[3]   The facts of *Perri* and *Cucchiara*, however, are significantly more egregious than the facts of the present case and demonstrate that the facts in the present case do not rise to the level of even plain indifference as that term was understood in *Perri* and *Cucchiara*.

In *Perri,* as this court previously observed, an undercover officer (posing as a friend of a cooperating convicted felon) and the felon attempted to purchase a firearm and, when he was informed he could not purchase a firearm, the licensee sold a firearm to the friend *knowing* that the friend would give the gun to the felon, which in fact the friend did.   637 F.2d at 1335 ("Demara departed with the gun").   The next week, the licensee again effectively sold a second firearm to the same felon who came in with a friend (an undercover officer) and the felon said he needed a smaller firearm for his wife.   This time, the felon acted even more blatantly: "Demara paid the price, took the change, gun, ammunition, and receipt and left the store."   637 F.2d at 1335.

In *Cucchiara*, the court held that hundreds of violations of legal requirements, including repeated failure to record the acquisition and disposition of firearms and scores of sales of firearms to ineligible purchasers, combined with notice to the seller that future violations could be considered willful, supported a finding of willfulness.   The court also considered in its willfulness analysis that:

> . . . [A] recent investigation of plaintiff's records revealed additional sales to ineligible purchasers, unreported multiple handgun sales, repeated failure to record

---

[3]   The Fourth Circuit has noted that plain indifference means that the licensee "simply does not care about the legal requirements." *RSM, Inc. v. Herbert*, 466 F.3d 316, 322 (4th Cir. 2006). Red's believes that the necessity to show *"plain* indifference" is not a small matter of word choice but is, instead, a very deliberate emphasis by the courts upon the just how profoundly the ATF must show a licensee ignored the requirements of the law if the ATF is unable to show puposeful disregard.

**PETITIONER'S POST-HEARING BRIEF - 5**

the acquisition and disposition of firearms and a loss without reasonable
explanation of 200 firearms.

652 F.2d at 29.

In the case at bar, there is no evidence of sales to ineligible persons, let alone knowing

sales, and no evidence of loss of any firearms, let alone hundreds. Thus, the plain indifference

shown in *Perri* and *Cucchiara* is not present here.

Moreover, *Perri* and *Cucchiara* predate the Firearm Owners Protection Act of 1986, Pub.

L. 99-308, 100 Stat. 449 (1986), which added the explicit requirement of "willfulness" to § 923(e)

for the revocation of a firearms license as a result of any violation of the Act or its regulations.

Their precedential value is, therefore, diminished in the light of such subsequent legislation,

particularly to the degree that they are interpreted to approve a view of willfulness that authorizes

the revocation of a license for acts which are not as egregious as those in *Perri* and *Cucchiara*.

See *United States v. State of Washington,* 872 F.2d 874, 880 (9th Cir. 1989)("'We are bound by

decisions of prior panels <u>unless</u> . . . <u>subsequent legislation undermines those decisions</u>")

(emphasis added). See also *Miller* v. *Gammie*, 335 F.3d 889, 899 (9th Cir. 2003)("circuit

precedent, authoritative at the time that it issued, can be effectively overruled by subsequent

Supreme Court decisions that 'are closely on point,' even though those decisions do not expressly

overrule the prior circuit precedent.").

The significance of adding "willfully" to § 923(e) is that "willfully" has a long usage in

the law, so its "established meaning" must be applied. *See NLRB v. Amax Coal Co.,* 453 U.S.

322, 329 (1981)("Where Congress uses terms that have accumulated settled meaning under either

equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress

means to incorporate the established meaning of these terms"). Thus, as the statute does not

otherwise dictate, Congress meant to incorporate the established meaning of "willfully." Most

**PETITIONER'S POST-HEARING BRIEF - 6**

recently, *Safeco Ins. Co. Of America, et al.*, v. *Burr, et al.*, 551 U.S. __, 127 S.Ct. 2201 (2007), explained the "established meaning" of "willfully" in a civil regulatory statute. *Safeco* concerned, *inter alia*, the meaning of "willfully" in the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, which imposes civil liability on "[a]ny person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer," 15 U.S.C. § 1681n(a). *Safeco* held:

> [W]here willfulness is a statutory condition of civil liability, we have <u>generally</u> taken it to cover not only knowing violations of a standard, but reckless ones as well . . . . This construction reflects <u>common law usage</u>, which treated actions in "reckless disregard" of the law as "willful" violations. . . .

127 S.Ct. at 2208 (emphasis added).

Indeed, *Safeco* went on to note that "standard civil usage" applies because "Congress knows how we construe statutes and expects us to run true to form" and "under the general rule that a common law term in a statute comes with a common law meaning, absent anything pointing another way . . . ." *Id.* There is nothing in § 923 or its legislative history "pointing another way . . . ." On the contrary, the legislative history of § 923(e), found in S. Rep. No. 98-583,[4] is consistent with the common law meaning. S. Rep. No. 98-583 described the purpose for adding "willfully" to § 923(e): "to ensure that licenses are not revoked for inadvertent errors or technical mistakes." S. Rep . No. 98-583 at 88.

> *Safeco* also noted that a company subject to FCRA:
> does not act in reckless disregard of it unless the action is not only a violation

---

[4]*National Rifle Ass'n v. Brady*, 914 F.2d 475 (4th Cir. 1990) held that S. Rep. No. 98-583 was the applicable report for the FOPA:

> There was no Senate Report on Pub. L. No. 99-308. S. Rep. No. 98-583 accompanied S. 914, the substantially similar predecessor to S. 49, the Senate bill which was the basis for Pub. L. No. 99-308.

914 F.2d at 485.

Thus, S. Rep. No. 98-583 should be accorded substantial weight because a "committee report represents the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *Zuber v. Allen*, 396 U.S. 168, 186 (1969).

**PETITIONER'S POST-HEARING BRIEF - 7**

under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

Thus, mere carelessness is not recklessness. *Rich v. U.S.,* 383 F. Supp. 797, 801 (S.D. Ohio, 1974) ("While the Secretary [of the Treasury] has shown negligence, he has not shown willful violation of the statute or rules and regulations promulgated thereunder."). Indeed, it is illogical to equate "willfulness" with mere "negligence" in that the root of the word "willful" is "will" which contemplates a conscious, deliberate, considered act. For that matter, if Congress had intended the latter to be a sufficient ground to revoke a federal license, then it would have surely use such a term which, unlike "willfulness," would have easily included thoughtlessness and carelessness.

*Safeco*'s understanding of willfulness was plainly intended to apply broadly to any federal civil regulatory statute. While it concerned the Fair Credit Reporting Act, the Court concluded, on the basis of case law discussing other, unrelated statutes, that, "where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well." In particular, the Court relied on *McLaughlin* v. *Richland Shoe Co.*, 486 U.S. 128 (1988) (Fair Labor Standards Act); *Trans World Airlines, Inc.* v. *Thurston,* 469 U.S. 111 (1985)(Age Discrimination in Employment Act of 1967); and *United States v. Illinois Central R. Co.,* 303 U.S. 239 (1938)(Act of June 29, 1906, 34 Stat. 607, concerning the care of animals being transported by railroads).[5] The Court said nothing which suggested any limit to the application of the meaning of "willfully" established over many years in

---

[5] *United States v. Illinois Central Railroad* stated:
   [W]e are persuaded that it [willfully] means purposely or obstinately and is designed to describe the attitude of a [person], who, having a free will or choice, either intentionally disregards the statute or is plainly indifferent to its requirements.
303 U.S. at 243.

**PETITIONER'S POST-HEARING BRIEF - 8**

these cases.

> To emphasize that it was adopting a general civil standard, the Court stated: <u>This construction reflects common law usage</u>, which treated actions in "reckless disregard" of the law as "willful" violations. . . . The <u>standard civil usage</u> thus counsels reading the phrase "willfully fails to comply" in § 1681n(a) as reaching reckless FCRA violations, and this is so both on the interpretive assumption that Congress knows how we construe statutes and expects us to run true to form, and under the general rule that a common law term in a statute comes with a common law meaning, absent anything pointing another way . . . . [emphasis added; citations omitted].

127 S.Ct. at 2208 (emphasis added).[6]

This court should adhere to *Safeco*'s interpretation of "willfully." To the extent *Perri* and *Cucchiara* are inconsistent with *Safeco*, this court should abjure the decisions in *Perri* and *Cucchiara*.

### III.   THE SPECIFIC ALLEGED VIOLATIONS WERE NOT VIOLATIONS OR WERE NOT DONE WILLFULLY

<u>Count I</u>:   Respondent claims that Red's willfully twice violated 18 U.S.C. § 922(m) and § 923(g)(1)(A) and 27 C.F.R. § 478.121 and § 478.124 when it "failed to record the description of the firearm in item #16 of ATF Form 4473 . . . ." Item 16 requires the licensee to indicate whether the firearm being transferred is a "Handgun," "Long gun," or "Both." AR 25, 27. Completion of Item 16 is not required by law and, if it was, the Government has not proven, by a preponderance of the evidence, that Red's acted "willfully."

18 U.S.C. § 922(m) provides in pertinent part:

---

[6] *Safeco* stated that *Bryan v. United States,* 524 U.S. 184 (1998) recognized that "willfully" is a "word of many meanings whose construction is often dependent on the context in which it appears. . . . ." 524 U.S. at 191. In this statement, the Court was not, however, distinguishing possible various interpretations of "willfully" in civil usage (if any), but distinguishing between "willfully" in civil and criminal usage. *Bryan* went on to state: "Most obviously ["willfully"] differentiates between deliberate and unwitting conduct, but in the criminal law it also typically refers to a culpable state of mind." *Bryan*, 524 U.S. at 191. Thus, *Bryan* requires, in civil enforcement statutes, that conduct be deliberate to be "willful."

**PETITIONER'S POST-HEARING BRIEF - 9**

It shall be unlawful for any . . . licensed dealer . . . knowingly . . . to fail to make appropriate entry in, or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder. [Emphasis added].

18 U.S.C. § 923(g)(1)(A) provides in pertinent part:

Each . . . licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe. [Emphasis added].

The only regulation regarding identification of the firearm to be transferred is 27 C.F.R. § 478.124(c)(4),[7] which only requires the transferor (licensee) to "identify the firearm to be transferred by listing on the Form 4473 the name of the manufacturer, the name of the importer (if any), the type, model, caliber, or gauge, and the serial number of the firearm."[8] There is no regulation requiring that a licensee indicate whether the firearm being transferred is a "Handgun," "Long gun," or "Both."

Red's complied with 27 C.F.R. § 478.124(c)(4) by completing Items 24-28, which explicitly and fully described each of the firearms in question in detail, on the two Forms 4473 in question. Because, in not completing Item 16 on two ATF Forms 4473, Red's did not violate a regulation, Red's did not violate 18 U.S.C. § 922(m) and § 923(g)(1)(A) or 27 C.F.R. § 478.121. Moreover, because 27 C.F.R. § 478.124 does not require that a licensee indicate whether the firearm being transferred is a "Handgun," "Long gun," or "Both," Red's did not violate 27 C.F.R. § 478.124.

---

[7] 27 C.F.R. § 478.121(c) merely repeats 18 U.S.C. § 923(g)(1)(A):
Each . . . licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition, whether temporary or permanent, of firearms . . . as the regulations contained in this part prescribe.
[8] Items 24-28 on the Form 4473 require the transferor to provide the name of the manufacturer, the name of the importer (if any), the type, model, caliber, or gauge, and the serial number of the firearm.

**PETITIONER'S POST-HEARING BRIEF - 10**

Respondent did not base his decision upon 27 C.F.R. § 478.21(a) in 2006, but raised it as additional support for his decision in his Motion for Summary Judgment in this litigation.  See Respondent's Memorandum in Support of Motion for Summary Judgment, pages 12-13.  27 C.F.R. § 478.21(a) states:

> The Director is authorized to prescribe all forms required by this part.  All of the information called for in each form shall be furnished as indicated by the headings on the form and the instructions on or pertaining to the form.  In addition, information called for in each form shall be furnished as required by this part.

27 C.F.R. § 478.21(a) is invalid to the extent that it purports to delegate to the Director the authority unilaterally to demand information not required by statute or regulation simply by prescribing a box for it on the Form 4473.  18 U.S.C. § 923(g)(1)(A) only requires a licensed dealer to maintain records "in such form, as the Attorney General may by <u>regulations</u> prescribe" (emphasis added) and neither 27 C.F.R. § 478.21(a), nor any other regulation, establishes a requirement for such information.[9]

27 C.F.R. § 478.21(a) purports to be a legislative rule, *i.e.*, a rule that has the force and effect of law.  *Batterton v. Francis,* 432 U.S. 416, 432 (1977).  To have the "force and effect of

---

[9] ATF can be specific when it wants, as witness § 478.124(c)(1) which states that a licensee:

> …[S]hall obtain a Form 4473 from the transferee showing the transferee's name, sex, residence address (including county or similar political subdivision), date and place of birth; height, weight and race of the transferee; whether the transferee is a citizen of the United States; the transferee's State or residence; and certification by the transferee that the transferee is not prohibited by the Act from transporting or shipping a firearm in interstate or foreign commerce or receiving a firearm which has been shipped or transported in interstate or foreign commerce or possessing a firearm in or affecting commerce.

§ 478.124(c)(3)(i) states in pertinent part that a licensee "shall note on the Form 4473 the type of identification used . . . ."

§ 478.124(c)(4) states in pertinent part that a licensee "shall identify the firearm to be transferred by listing . . . the name of the manufacturer, the name of the importer (if any), the type, model, caliber or gauge, and the serial number of the firearm."

§ 478.124(c)(5) states that the licensee "shall sign and date the form . . . ."

**PETITIONER'S POST-HEARING BRIEF - 11**

law," a regulation must "have certain substantive characteristics and be the product of certain procedural requisites." *Chrysler Corp. v. Brown*, 441 U.S. 281, 301 (1979). In particular, "an agency shall afford interested persons general notice of proposed rulemaking and an opportunity to comment before a substantive rule is promulgated." 441 U.S. at 313. 27 C.F.R. § 478.21(a) is not a valid legislative rule because it purports to delegate authority to the agency to create new obligations without notice and an opportunity to comment. 18 U.S.C. § 923(g)(1)(A) does not countenance such unrestrained, unilateral action. Indeed, if Respondent is correct, 27 C.F.R. § 478.21(a) would let the Government demand any sort of information from a firearms transferee merely by changing the layout of Form 4473 without any opportunity for public comment. Such conduct is incompatible with the notice and comment procedures set forth in 18 U.S.C. § 926(b), 5 U.S.C. § 553(b), and § 553(c). Strict adherence to those procedures are indispensable if a regulation is to be accorded the force and effect of law. *Chrysler Corp., supra*, 441 U.S. at 281.

 *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759 (1969), explained:

> The rule-making provisions of that Act [5 U.S.C. § 553], which the Board would avoid, were designed to assure fairness and mature consideration of rules of general application. . . . There is no warrant in law for the Board to replace the statutory scheme with a rule-making procedure of its own invention.

394 U.S. at 764.

 The same is true here; by purportedly delegating to itself the authority to impose requirements that are not imposed by regulation, ATF evades the process created by Congress in 18 U.S.C. § 926(b) and 5 U.S.C. § 553 to assure "fairness and mature consideration of rules of general application." Thus, to the extent that 27 C.F.R. § 478.21(a) purports to delegate to the Director the authority to call for information on the Form 4473 which is not required by a duly promulgated regulation, 27 C.F.R. § 478.21(a) is invalid.

 A similar situation was addressed in *Mission Group Kansas, Inc. v. Riley*, 146 F.3d 775

**PETITIONER'S POST-HEARING BRIEF - 12**

(10th Cir. 1998), where the regulation in question authorized the Secretary of Education to

condition "initial and continued participation of an eligible institution in any Title IV, HEA

program":

> upon compliance with the provisions of this part, the individual program
> regulations, and *any additional conditions* specified in the program participation
> agreement that the Secretary requires the institution to meet.

146 F.3d at 778 (emphasis by court).

Pursuant to the purported "additional conditions" authority, the Secretary imposed the

"85/15 rule" (to participate in Title IV programs, institution had to derive at least 15% of its gross

revenues from sources other than Title IV).  In holding that the "85/15 rule" could not be applied,

the court noted:

> Because the plain language of both regulations is entirely unrestrictive, the
> Secretary could insert *any* condition into a program participation agreement, and
> claim authorization for that action under the plain terms of §§ 668.13(c)(4)(ii) or
> 668.14(a)(1).  *Chevron* deference to that condition would be inappropriate because,
> unless interested parties could reasonably anticipate the application of the
> regulation advanced by the agency such that they had a meaningful opportunity for
> notice and comment on the conditions to be selected, the imposition of an
> additional condition would not actually follow from an exercise of the agency's
> delegated policymaking authority.

146 F.3d at 781-82.

> Stated another way, the dispositive question is whether imposition of the 85/15 rule
> is a *new* rule, in which case the agency may not give it binding effect in the
> absence of compliance with APA notice and comment procedures, or an
> *interpretation* of an existing rule, in which case it is binding precisely because it
> has, in effect, already been subject to the necessary procedural protections.

146 F.3d at 782.

Without the "safeguard" of "potentially affected parties [being] given an opportunity to

comment on the 'interpretation' now advanced," agencies could simply:

> replace statutory ambiguity with regulatory ambiguity, thus creating *Chevron*
> deference for any administrative action that might be squeezed within the

**PETITIONER'S POST-HEARING BRIEF - 13**

unrestricted terms of a promulgated regulation. Such a practice would make a
mockery of *Chevron,* the APA, and judicial review because "the very purpose
behind the delegation of lawmaking power to administrative agencies . . . is to
'resol[ve] . . . ambiguity in a statutory text.'" *Thomas Jefferson Univ.,* 512 U.S. at
525 (Thomas, J., dissenting) (quoting *Pauley v. BethEnergy Mines, Inc.,* 501 U.S.
680, 696 (1991). "'An agency whose powers are not limited either by meaningful
statutory standards or . . . legislative rules poses a serious potential threat to liberty
and to democracy.'" *Id.* (quoting II Davis & Pierce § 11.5, at 204).

146 F.3d at 782.

The court thus concluded:

[T]he administrative action taken by the Secretary here cannot be regarded as
within the legitimate interpretive scope of the regulations upon which he purports
to have acted. The plain language of the regulations is entirely unrestricted . . . .
We cannot therefore view the Secretary's actions as a proper interpretation of his
own regulations because it is no interpretation at all.

146 F.3d at 782-83.

The same is true with respect to Respondent's reliance on 27 C.F.R. § 478.21(a) to grant

the ATF authority "to prescribe all forms" and to require that "[a]ll of the information called for

in each form shall be furnished as indicated by the headings on the form and the instructions on or

pertaining to the form . . . ." Such language cannot be used to justify the insertion of "*any*

[requirement] into" the forms, without the safeguard of "potentially affected parties [being] given

an opportunity to comment on the 'interpretation'" being advanced. As in *Mission Group Kansas,*

*Inc.,* 27 C.F.R. § 478.21(a) "make[s] a mockery of *Chevron,* the APA, and judicial review . . . ."

146 F.3d at 782.

*United States v. Picciotto,* 875 F.2d 345, 346 (D.C. Cir. 1989) considered a rule

promulgated by the Park Service that included an "open-ended provision" purportedly allowing

the Service to include "additional reasonable conditions and additional time limitations" in a

permit for a demonstration. In reliance thereon, the Park Service added a condition to Picciotto's

permit which she was later convicted of violating. Rejecting the Park Service's argument that the

**PETITIONER'S POST-HEARING BRIEF - 14**

additional condition was valid, the court explained that the Park Service was, in essence, claiming

that an agency:

> can grant itself a valid exemption to the APA for all future regulations, and be free
> of APA's troublesome rulemaking procedures forever after, simply by announcing
> its independence in a general rule.

875 F.2d at 347.

"That is not the law. Such agency-generated exemptions would frustrate Congress'

underlying policy in enacting the APA by rendering compliance optional." *Id.*

In light of the foregoing authority, requirements for information found in the Form 4473,

but not set clearly forth in a particular regulation that has been promulgated pursuant to normal

opportunities for notice and comment, are invalid and cannot form the basis for the revocation of a

license. Since Item 16 was included in Form 4473 without proper notice and comment, the fact

that Red's did not complete it on two occasions did not violate any regulation. Because § 923

only authorizes license revocation for a violation of the statute or a regulation, the failure to

complete Item 16 is not a valid basis for license revocation.

Further, in not completing Item 16 on two ATF Forms 4473, Red's did not act willfully.

ATF Inspector Rushing testified that he reviewed 430 ATF Forms 4473 to find these two isolated

errors (HT 81), so that there were 428 forms on which the information was recorded. HT 150.[10]

He also testified that, in Block 27, the licensee has to indicate pistol, revolver, rifle, or shotgun,

and the forms themselves show that Block 27 was completed on both forms at issue. HT 151.

Finally, he testified that his investigation revealed that Item 16 on the two forms at issue was

"simply overlooked." HT 150. He previously testified in the administrative hearing that Red's

---

[10] Notably, the ATF Inspector who inspected Red's in May 2001 decided that an error rate
of less than 1% in the completion of Form 4473s was so trivial that the inspector recommended no
further action be taken (HT 211) and, in his report, the inspector stated: "They have established
procedures to ensure Forms 4473 are completed correctly." HT 212.

**PETITIONER'S POST-HEARING BRIEF - 15**

was "was shocked and dismayed" that, on two out of 430 forms, one item had not been completed. AR 166. Mr. Horsley explained, without contradiction, that it was "the store policy that Block 16 is supposed to be completed." AR 225.

Several of Red's former and current employees testified, again without contradiction, concerning their training by Red's with respect to Forms 4473. Jason Farr, currently with the Twin Falls County Sheriff's Office, and with fifteen years in law enforcement (HT 282), testified that, in 2000, when he started working at Red's:

> Ryan had gone over the forms with me explaining what we needed to have the customers fill out. From that point he would go over where and what we needed to fill out as far as information on the back side of the form. And at that point when we would fill out the forms, we would have it double-checked either by Ryan or Terry or one of the other full-time employees.

HT 282.

Former employee Seth Ruhter, currently a bank regulator for the Idaho Department of Finance, was a part-time employee of Red's in the 2000-2001 time period. HT 289. He testified that the employees "got a lot of training. That was something that they, you know, made a big deal about. They wanted to do it right." HT 290. He also explained that "we would go through a form, we would practice filling one out, look at it, you know, it would take a period of time until he got comfortable with the process and we were doing it correctly. And then we would still have oversights." HT 299. After a sale, "we would still have Ryan [Horsley] look over [a Form 4473] or a coworker if Ryan wasn't there." HT 291. Ruhter also testified that Red's had meetings with the employees; in fact, "we had lot of store meetings, we talked about how to fill these out correctly." HT 296.

Current full-time employee Matt Bunch testified that, after a form was completed, "[e]ither Ryan or Terry would look it over before it was taken out of the logbook." HT 302.

**PETITIONER'S POST-HEARING BRIEF - 16**

In sum, there was no evidence, let alone a preponderance of evidence, that the omissions were (applying the *Safeco* interpretation of "willfully") knowing or reckless violations of a legal obligation, or, even under *Perri/Cucchiara*, purposeful or the result of plain indifference.

Count II:   Respondent decided that Red's willfully violated 18 U.S.C. § 922(t) and 27 C.F.R. § 478.102 when, "on one occasion the Licensee allowed a Nevada resident to purchase a rifle without first completing an ATF Form 4473 or having an NICS background check completed . . . ." The Nevada resident was Randall Adams.  HT 94.

In not completing an ATF Form 4473 or having an NICS background check completed, the Government has not proven, by a preponderance of the evidence, that Red's acted willfully.

> Inspector Rushing testified that his investigation revealed that the firearm:
> was a special-order firearm specifically for this person and that there was a good
> chance a miscommunication happened between the employees, between the staff,
> when this firearm, indeed, went over the counter and out that door to that person.

HT 95.

Inspector Rushing further testified that Red's "provided subsequently during that inspection an invoice from his distributor that he had placed this order." HT 154.  Inspector Rushing found no evidence about the reason the Form 4473 had not been completed at the time of the transfer, other than that there "was simply a miscommunication" between Ryan Horsley and his staff about whether the Form 4473 had been completed when the firearm was ordered.  HT 155.

Mr. Horsley testified, without contradiction, that the firearm was "a special order" (HT 229) and that one of his "employees had taken the notion that the paperwork had been filled out without bothering to check that and sent Mr. Adams out with a gun."  HT 232.  He explained that there had been "a miscommunication" between him and the employee.  HT 232.  He further explained that sometimes a Form 4473 would be completed when the firearm was ordered and

**PETITIONER'S POST-HEARING BRIEF - 17**

sometimes a Form 4473 would be completed at the time the firearm was transferred.  HT 233.  In either event, however, the Form 4473 "would still have to be finalized when [the buyer] returned to the store."  HT 234.  Mr. Horsley also testified that Randall Adams had "previously bought firearms from Red's" (HT 331), that he (Mr. Horsley) had personally "special-ordered" the firearm for Mr. Adams (HT 331), and that Mr. Adams "came in on a weekend" to pick up the firearm.  HT 331.  As it was Mr. Horsley's day off, he "had informed [his] employees" that Mr. Adams "was coming" to pick up the firearm.  HT 332.  At the Administrative Hearing, the ATF witness testified that he determined that "this was a special ordered gun" and that "another employee thought that the form was already completed and went ahead and sent the gun out. Pretty much, in a nutshell, it came down to possible miscommunication between employees."  AR 171.  He also testified that, for a 6 month period, Red's had 430 transactions recorded on Forms 4473.  AR 162.  Mr. Horsley testified that the "employee thought that Mr. Adams had already completed the 4473."  AR 227.

Mr. Horsley testified, without contradiction, that it was "[a]bsolutely not" the "purpose of Red's in making that sale without the 4473 being completed to purposely disregard the law at that point" and that it was "[a]bsolutely not" done because Red's "simply did not care about the law." HT 333.  It was "a mistake."  HT 333.

In light of the above facts,  the Government has not proven, by a preponderance of the evidence, that Red's, in not completing an ATF Form 4473 or having an NICS background check completed, acted willfully.  Under the *Safeco* interpretation of "willfully," *i.e.*, a knowing or reckless violation of a legal obligation, a single omission resulting from a miscommunication between employees where Red's completed about 1,000 Forms 4473 per year is not a willful violation. Even under the *Perri/Cucchiara* standard of plain indifference to a legal obligation, this

single omission resulting from a miscommunication between employees does not reasonably demonstrate that Red's simply did not care about its obligations.

Count III:   Respondent determined that "the licensee failed to post the required signs alerting purchasers to the dangers of juveniles and handguns, nor did the Licensee distribute the required pamphlets containing the same information . . . .," as required by 27 C.F.R. § 478.103.[11]

18 U.S.C. § 923(g)(1)(A) provides in pertinent part:

Each . . . licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for

---

[11] Respondent erroneously cited the applicable regulation as 27 C.F.R. § 478.102.  27 C.F.R. § 478.103 states in pertinent part:

(a) Each licensed importer, manufacturer, dealer, or collector who delivers a handgun to a nonlicensee shall provide such nonlicensee with written notification as described in paragraph (b) of this section.

(b) The written notification (ATF I 5300.2) required by paragraph (a) of this section shall state as follows: (1) The misuse of handguns is a leading contributor to juvenile violence and fatalities. (2) Safely storing and securing firearms away from children will help prevent the unlawful possession of handguns by juveniles, stop accidents, and save lives. (3) Federal law prohibits, except in certain limited circumstances, anyone under 18 years of age from knowingly possessing a handgun, or any person from transferring a handgun to a person under 18. (4) A knowing violation of the prohibition against selling, delivering, or otherwise transferring a handgun to a person under the age of 18 is, under certain circumstances, punishable by up to 10 years in prison.

* * *

(d) Except as provided in paragraph (f) of this section, each licensed importer, manufacturer, or dealer who delivers a handgun to a nonlicensee shall display at its licensed premises (including temporary business locations at gun shows) a sign as described in paragraph (e) of this section. The sign shall be displayed where customers can readily see it.

(e) The sign (ATF I 5300.1) required by paragraph (d) of this section shall state as follows: (1) The misuse of handguns is a leading contributor to juvenile violence and fatalities. (2) Safely storing and securing firearms away from children will help prevent the unlawful possession of handguns by juveniles, stop accidents, and save lives. (3) Federal law prohibits, except in certain limited circumstances, anyone under 18 years of age from knowingly possessing a handgun, or any person from transferring a handgun to a person under 18. (4) A knowing violation of the prohibition against selling, delivering, or otherwise  transferring a handgun to a person under the age of 18 is, under certain circumstances, punishable by up to 10 years in prison.

such period, and in such form, as the Attorney General may by regulations prescribe.

This authority is limited by 18 U.S.C. § 926(a), which provides that "[t]he Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter . . . ."[12]  27 C.F.R. § 478.103 is not a record of importation, production, shipment, receipt, sale, or other disposition of firearms, and is thus not authorized by 18 U.S.C. § 923(g)(1)(A) and is invalid.

An agency may promulgate legislative regulations only where "Congress has explicitly left a gap for the agency to fill . . . ." *Chevron U.S.A. Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 843 (1984).  A "statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 159 (2000).  But § 923(g)(1)(A), is unambiguous and there is no gap left for the agency to fill, so that § 478.103 exceeds the agency's statutory authority.

If, however, by some stretch of the imagination, § 923(g)(1)(A) might be construed as authorizing 27 C.F.R. § 478.103, that construction should not be adopted because it raises a serious question of whether § 923(g)(1)(A) violates the First Amendment.  See *Wooley v. Maynard,* 430 U.S. 705, 717 (1977)(government's interest in disseminating an ideology "cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message").  In the case of 27 C.F.R. § 478.103, the Government, by executive fiat, is attempting to use licensees to be the courier of an social message that has nothing directly to do with the

---

[12] *National Rifle Ass'n v. Brady,* 914 F.2d 475, 479 (4th Cir. 1990), observed: "Because § 926 authorizes the Secretary to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'  The court, however, did not suggest that regulations are legitimate merely because the agency believes them to be necessary.  On the contrary, the court stated that § 926 "surely counsels BATF not to stray from the directives of the statute . . . ." *Id.*

**PETITIONER'S POST-HEARING BRIEF - 20**

acquisition and disposition of firearms.

In not posting the poster or distributing the pamphlets, the Government has not proven, by a preponderance of the evidence, that Red's acted willfully. Inspector Rushing testified that Mr. Horsley told him, during the 2005 inspection, that Red's "was unaware of the requirement" to distribute brochures. HT 101. Inspector Rushing testified also that, during the 2000 and 2001 inspections, the requirement to distribute brochures "had never been addressed to Mr. Horsley . . . ." HT 157. With respect to the poster, Inspector Rushing testified that Mr. Horsley told him that "at one time they had it posted on the wall for public view. He also explained that they had recently had a remodel and that poster more than likely came down and was never put back up." HT 102.

Mr. Horsley testified that, in 1998, Red's "received the poster, the pamphlets, the pamphlets went out, and basically we ran out [and] they were not reordered." HT 265. Further, in both the 2000 and 2001 inspections, nothing was said to Red's about the pamphlets not being there. HT 266. Prior to the 2005 inspection, it was Red's understanding, in light of the 2000 and 2001 inspections, that the brochures were "being distributed in new firearms, but that was it." HT 266. Further, it was Red's understanding, in light of the 2000 and 2001 inspections, that a licensee was to "place them on displays for people to pick them up." HT 335. It was not until the 2005 inspection that Red's was informed by an ATF inspector that it was to distribute the pamphlets to firearms purchasers. HT 335-336. Because Red's understanding was that distribution of the pamphlets was voluntary as it had not been instructed to the contrary in either the 2000 or 2001 inspection, the pamphlets had not been "reordered after they ran out, the initial supply" (HT 337) and Red's "neglected to reorder them." HT 362. Mr. Horley explained, without contradiction, that Red's failure not to distribute the pamphlets was not because Red's

**PETITIONER'S POST-HEARING BRIEF - 21**

"just simply didn't care about what the law required." HT 337.

With respect to the poster, Mr. Horsley testified that "the poster was up during the 2000 and 2001 inspection" (HT 335), but "the store was remodeled [in 2003 or 2004 (HT 335)] and the poster was taken down for the remodeling" and was not put up again due to "an oversight." HT 334. Mr. Horsley testified that, in not putting up the poster, Red's was not "just simply disregarding the law" and that the reason was not that Red's "just simply didn't care about the law." HT 335.

In light of the above facts, in not displaying the sign or distributing the pamphlets, Red's did not act willfully under either the *Safeco* interpretation of "willfully," or the *Perri/Cucchiara* standard of plain indifference to a legal obligation.

Count IV:   Respondent found that Red's willfully violated 18 U.S.C. § 922(m) and § 923(g)(1)(A) and 27 C.F.R. § 478.121 and § 478.124 in that, "on 320 occasions the Licensee failed to record the county of residence on ATF Form 4473 . . . ."

18 U.S.C. § 922(m) makes it unlawful for any licensed dealer to, "knowingly . . . to fail to make appropriate entry in, or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder." (Emphasis added). 18 U.S.C. § 923(g)(1)(A) requires each licensed dealer to "maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe." (Emphasis added).[13]

---

[13] As noted above, 27 C.F.R. § 478.121(c) merely repeats 18 U.S.C. § 923(g)(1)(A):

Each . . . licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition, whether temporary or permanent, of firearms . . . as the regulations contained in this part prescribe.

The only regulation regarding place of residence is 27 C.F.R. § 478.124(c)(1), which

requires only that a licensee obtain from the transferee an ATF Form 4473 showing, *inter alia*, the

transferee's "residence address (including county **or** similar political subdivision) . . . ." (emphasis

added).  As Red's obtained from each transferee an ATF Form 4473 showing, *inter alia*, the

transferee's residence address, including the political subdivision (Gov't Ex. 5, AR 41-58), Red's

did not violate 27 C.F.R. § 478.124(c)(1) and thus did not violate 18 U.S.C. § 922(m) and §

923(g)(1)(A) or 27 C.F.R. § 478.121.[14]

Even if the regulation could be construed to require the county in all instances, in not

ensuring the recording of the county, the Government has not proven, by a preponderance of the

evidence, that Red's acted willfully.  Although ATF inspectors had examined some 970 Forms

4473 in the 2000 inspection (HT 44) and some 1,400 Forms 4473 in the 2001 inspection (HT

211), Mr. Horsley testified, without contradiction,  that nothing was said to Red's "in 2000 about

the fact that the county was not on the form" nor was anything said to Red's "after the 1400 forms

were reviewed in 2001 about not putting the county on as a separate item on the form."  HT 266.[15]

Thus, as of the 2001 inspection, Red's was led to believe that "the way [it was] keeping the forms

was correct."  HT 338.[16]  It was thus reasonable for Red's to believe that its application of the

residence address requirement was correct.  Consequently, even if the county must be included,

Red's did not act willfully under either the *Safeco* interpretation of "willfully," or the

---

[14] To the extent Van Loan contends that Red's violated 27 C.F.R. § 478.21(a), Red's
incorporates, as to Count IV, the argument as to the validity of 27 C.F.R. § 478.21(a) set forth
above with respect to Count I.

[15] Inspector Rushing confirmed this when he was asked, "With regard to the county,
putting the county of residence, there was nothing documented in the prior inspections that that
had been brought to Red's attention before?" and he responded, "Nothing that I can identify."  HT
163.

[16] Mr. Horsley testified that he asked Inspector Rushing, "Why has this not been brought
to our attention in previous audits?" and he responded, "Different inspectors look for different
things."

**PETITIONER'S POST-HEARING BRIEF - 23**

*Perri/Cucchiara* standard of plain indifference to a legal obligation.

Count V:   Respondent decided that Red's willfully violated 18 U.S.C. § 922(m) and § 923(g)(1)(A) and 27 C.F.R. § 478.121 and § 478.124 in that, "in all instances where a purchaser utilized an Idaho Carry/Conceal Permit as identification, the Licensee failed to record the required information in item #18a of ATF Form 4473 . . . ." Item 18a requires that the licensee record the type, number, and expiration date of the purchaser's identification.  Gov't Ex. 6 (AR 60-69).

In not recording ID information in Block 18a, the Government has not proven, by a preponderance of the evidence, that Red's acted willfully.  Inspector Rushing testified that, under Idaho law, a State of Idaho carry/conceal permit can be used "in lieu of a background check, meaning a physical call in to the FBI for a background check."  HT 119.  When a customer of Red's was using an Idaho carry/conceal permit in lieu of an NICS check to the FBI, Red's also used the permit as a form of identification (HT 267) and, in every instance, completed Block 21 on the Form 4473 (which requires recording of the State Permit Type, Expiration Date, Date of Issuance, and Permit Number of the permit used as an alternative to the NICS check), but not Block 18 (which requires recording of information from the document used by the purchaser for identification: Type of Identification, Number on identification, and Expiration Date of identification).  HT 267-268 (See *e.g.*, Gov't Ex. 9-79).  Thus, al the information (and more) required by Block 18 was recorded in Block 21.

Inspector Rushing conceded that, if the "identical information" that was entered into Block 21 from an Idaho carry/conceal permit had "been entered into block 18a, [it] would have satisfied the requirement of block 18a . . . ."  HT 163.[17]  Mr. Horsley also testified that an Idaho concealed

---

[17] At the Administrative Hearing, Rushing testified that the Idaho Carry/Conceal Permit "does have all the required information as a normal government issued ID, aka, a driver's license would have.  Picture, date of birth, residence address, all that stuff."  AR 187.

**PETITIONER'S POST-HEARING BRIEF - 24**

weapons license "has all the same information as on your driver's license" and that in fact "your

driver's license number is actually on the concealed weapon permit." HT 269.[18]

Inspector Rushing also conceded that, despite there having been inspections in 2000 and

2001 where some 2,370 Forms 4473 were examined, the issue of the "use of the information from

the Idaho permit to carry had never been brought to Red's attention before." HT 163.[19]

Accordingly, Mr. Horsley testified, without contradiction, that, as of the 2005 inspection, because

Red's "had not been cited on that before" (HT 239) and because "this was government-issued ID"

(HT 268), "Red's was under the impression . . . that they did not have to include it if the person

was showing a concealed weapons license" (HT 239), *i.e.*, that the Idaho carry/conceal permit

"could be used in place of" a state ID card or driver's license.  HT 340.  At the Administrative

Hearing, Rushing agreed that Red's was not "aware that, in fact, they were required to fill out

both blocks."  AR 190.

With respect to one of Forms 4473 (involving Mr. Mauldin, Gov't Ex. 9-72-73), Red's

employee, Matt Bunch, testified that he obtained an Idaho concealed weapons license as

identification from Mr. Mauldin, but did not place the information in Block 18 because he "was

not aware that we needed to collect two types of photo identification for a concealed weapons

transaction."  HT 318.  He further testified that his failure to place the information in Block 18

was "[a]bsolutely" not because he "didn't care about completing the form."  HT 318.  Mr. Horsley

similarly testified that, in not filling out Block 18, Red's was not "intentionally or purposely

disregarding the law" and that its failure to complete Block 18 was not because Red's "just simply

---

[18] At the Administrative Hearing, Rushing also testified that the "permit number is the same as the driver's license number."  AR 188-189.

[19] Mr. Horsley agreed, stating that, during the 2000 inspection, nothing was "pointed out to [him] after the review of 4473 that that was not correct" and that, during the 2001 inspection, "when 1,400 forms were looked at," it was also not pointed out to him "that that was missing information."  HT 268.

**PETITIONER'S POST-HEARING BRIEF - 25**

didn't care about what the law required." HT 341.

In light of the above facts, Red's did not act willfully, under either the *Safeco or* the *Perri/Cucchiara* definitions.

Count VI:   Respondent decided that Red's willfully violated 18 U.S.C. § 922(m) and § 923(g)(1)(A) and 27 C.F.R. § 478.121 and § 478.124 in that, "on three occasions the Licensee failed to record accurate information on ATF Form 4473 items 19(a) and 19(c) . . . ." Item 19(a) requires the licensee to record the date the transferee's information was transmitted to NICS or the appropriate state agency; Item 19(c) requires the licensee to record the initial response provided by NICS or the appropriate state agency.  The requirement to complete Blocks 19(a) and 19(c) exceeds ATF's statutory authority.

18 U.S.C. § 922(t)(4) provides:

> If the national instant criminal background check system notifies the licensee that the information available to the system does not demonstrate that the receipt of a firearm by such other person would violate subsection (g) or (n) or State law, and the licensee transfers a firearm to such other person, the licensee shall include in the record of the transfer the **unique identification number** provided by the system with respect to the transfer. (Emphasis added).

Despite the express requirement in § 922(t)(4) that the licensee "shall include in the record of the transfer the **unique identification number** provided by the system with respect to the transfer," 27 C.F.R. § 478.124(c)(3)(iv) provides that, "[a]fter the transferee has executed the Form 4473, the licensee":

> Shall comply with the requirements of § 478.102 and record on the form the date on which the licensee contacted the NICS, as well as any response provided by the system, including any identification number provided by the system.

27 C.F.R. § 478.124(c)(3)(iv) is invalid to the extent it requires the licensee to record on the Form 4473 "the date on which the licensee contacted the NICS" or "any response provided by the system," in addition to the identification number provided by the system. "When a statute

**PETITIONER'S POST-HEARING BRIEF - 26**

limits a thing to be done in a particular mode, it includes the negative of any other mode." *Botany Mills v. United States*, 278 U.S. 282, 289 (1929). "This principle of statutory construction reflects an ancient maxim — *expressio unius est exclusio alterius.*" *Passenger Corp. v. Passengers Assn.*, 414 U.S. 453, 458 (1974). In § 922(t)(4), Congress expressly stated the mode in which it required licensees to keep record information related to the use of NICS, *i.e.*, licensees were to record "the unique identification number" of the transaction. Had Congress believed recording a date, or some other response, was necessary, it would have so stated. Indeed, because Congress required a "unique identification number," it is apparent that a date and some other response were not necessary since the requirement that the NICS provide a "unique" identification number enabled NICS to use a numbering system which itself reflected a date and a response.

Further, 18 U.S.C. § 926(a) provides in pertinent part that the Attorney General "may prescribe only such rules and regulations as are necessary to carry out the provisions of [Chapter 44] . . . ." To the extent 27 C.F.R. § 478.124(c)(3)(iv) requires the licensee to record on the Form 4473 the date on which the licensee contacted the NICS and "any response provided by the system," other than any identification number provided by the system, 27 C.F.R. § 478.124(c)(3)(iv) is not necessary, as matter of law, to carry out § 922(t)(4) because § 922(t)(4) establishes what information must be recorded.

*Chevron U.S.A. Inc., supra,* held that, where "Congress has directly spoken to the precise question at issue, . . . that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-843. An agency is permitted to promulgate legislative regulations only where "Congress has explicitly left a gap for the agency to fill . . . ." *Id.* Further, a "statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA v. Brown & Williamson Tobacco Corp.,*

*supra*, 529 U.S. at 159.   In § 922(t)(4), there is no statutory ambiguity or gap left for the agency to

fill in concerning what information must be recorded; Congress has expressly required only that

the licensee "shall include in the record of the transfer the unique identification number provided

by the system with respect to the transfer."   Thus, to the extent 27 C.F.R. § 478.124(c)(3)(iv)

requires the licensee to record on the Form 4473 the date on which the licensee contacted the

NICS and "any response provided by the system," other than any identification number provided

by the system, 27 C.F.R. § 478.124(c)(3)(iv) is invalid.

Further, even if 27 C.F.R. § 478.124(c)(3)(iv) is valid, in not recording information in

Blocks 19(a) and 19(c), the Government has not proven, by a preponderance of the evidence, that

Red's acted willfully.   Inspector Rushing testified that his investigation with regard to determining

why Blocks 19a and 19c were not completed revealed only that the entries on the three (3) — out

of 430 -- Forms 4473 were overlooked.   HT 166.[20]   Notably, on each of the three (3) Forms 4473,

there was an NICS transaction number, indicating that NICS had been contacted and that the

transaction had been approved.   That a scant 3 out of 430 Forms 4473 had an error is testament to

the system Red's had put in place whereby all Forms 4473 were reviewed by "a second set of eyes

. . . ."  HT 248.   The extent of the errors is also reflective of the overall care that Red's took in

preparing Forms 4473.   On the 4473 for John Henry Bloom, for example, in Block 19a the date is

missing.   HT 270.   But, on the first page of the Form 4473, there is a date of 5/7/05 and, on the

second page of the document is the same date entered by the salesman.   HT 270.   The second

Form 4473 was similarly completed.   HT 270-271.[21]   Thus, in addition to the fact that the NICS

---

[20] At the Administrative Hearing, Rushing testified that Red's did not complete Items 19a and 19c because "they just missed it."   AR 194.

[21] On the third Form 4473, there were three dates on the form, but they all had different years indicated.   HT 271.   Plainly, these were what would considered "typos" had the form been completed by typing.

**PETITIONER'S POST-HEARING BRIEF - 28**

check was done, the date of the transaction was entered on the form, albeit not in all three places indicated on the form. The salesman who conducted one of the transactions (Matt Bunch) testified that missing the date was an "error on my part" and not because he "didn't care about the[] forms being accurate." HT 317. He also explained that he had not omitted the date purposely. HT 317. Indeed, that these errors were nothing more than unintentional, inadvertent clerical oversights is supported by the fact that Red's properly completed some 427 Forms 4473.

In light of the above facts, Red's did not act willfully under either the *Safeco or* the *Perri/Cucchiara* standards.

Count VII: Respondent declined to pursue the allegation that Red's willfully violated 18 U.S.C. § 922(m) and § 923(g)(1)(A) and 27 C.F.R. § 478.121 and § 478.124 in that, "on one occasion the Licensee failed to record firearm identification information on ATF Form 4473 item 26 . . . ." See Respondent's Memorandum In Support Of His Motion for Summary Judgment (Docket No. 29-2), page 13, n.17.

Count VIII: Respondent decided that Red's willfully violated 18 U.S.C. § 922(m) and 27 C.F.R. § 478.125(e) in that, "on six occasions the Licensee failed to record the disposition of firearms in the timeframe required by statute . . . ." The six firearms were a Ruger Vaquero revolver, a Beretta pistol,[22] a Norinco shotgun, a Stoeger shotgun, a Bushmaster rifle, and a Savage rifle. 27 C.F.R. § 478.125(e) requires that the disposition of a firearm be recorded in the licensee's Acquisition & Disposition Record ("A&D") Book "not later than 7 days following the date of such transaction."

In failing to record the dispositions, the Government has not proven, by a preponderance

---

[22]  Respondent has declined to pursue the allegation concerning the Beretta pistol. See Memorandum 13, n.17. Further, Inspector Rushing agreed when he testified that "we are basically down to five dispositions that are at issue before the Court today . . . ." HT 174.

of the evidence, that Red's acted willfully.  Inspector Rushing testified concerning the Bushmaster

rifle that his investigation revealed that Red's had received the rifle and "returned it back to the

distributor [AccuSport]."  HT 169, 171.  He further found that "one of the employees entered it as

an acquisition [in the A&D Record book] as soon as it was received."  HT 169.  Mr. Horsley

testified that it was the "policy and practice of Red's with regard to logging in firearms received

from distributors" to "log them in right away."  HT 272.[23]  In the case of the Bushmaster rifle,

Red's had not ordered it, so it was "sent out promptly" to the distributor [AccuSport].  HT 272.  It

was not recorded as a disposition in the A&D Record book because Red's "employees had just

sent it back and had failed to notify Terry on that. . . . [It was] not even in there 24 hours."  HT

273.[24]

　　　　With respect to the Norinco shotgun, Inspector Rushing testified  that his investigation

revealed that "it was returned to the distributor was because the stock was broken" (HT 171) "for

a replacement or credit."  HT 172.  As with the Bushmaster rifle, the Norinco shotgun was not

recorded as a disposition in the A&D Record book because Red's "employees had just sent it back

and had failed to notify Terry on that. . . . [It was] not even in there 24 hours."  HT 273.[25]

　　　　With respect to the Ruger Vaquero,[26] Inspector Rushing's inspection revealed that it had

been transferred to Briggs Gun Shop, another licensee.  HT 172-173.  He had no other information

---

[23]  Mr. Horsley explained that, although the regulations required an acquisition entry to be made within 24 hours of receipt, Red's policy was to make the entry "right away."  HT 342.

[24]  Because the rifle was not in the store for even 24 hours, it did not even have to be recorded as an acquisition since ATF has taken the position that firearms returned "to the owner during the same business day" need not be "list[ed] in the 'bound book' as an 'acquisition.'"  *Federal Firearms Reference Guide*, ATF Pub. 5300.4 ("Questions & Answers"; #I2).  Thus, if the rifle did not have to be recorded as an acquisition, it did not have to be recorded as a disposition when it was returned to AccuSport.

[25]  As with the Bushmaster rifle, because the Norinco shotgun was not in the store for even 24 hours, it did not even have to be recorded as an acquisition, and thus as a disposition.  See previous footnote.

[26]  In the Hearing Transcript, "Vaquero" is misspelled as "Vicaro."

**PETITIONER'S POST-HEARING BRIEF - 30**

concerning the Ruger Vaquero.  Mr. Horsley testified that Ruger Vaquero was one of two

identical revolvers (except for the serial number (HT 274)) which were "sent out to the same

federal firearms license dealer" and "one was logged out, the other one was not."  HT 273-274.  In

the A&D Record book, the two revolvers were recorded as consecutive acquisitions (# 57609 and

#57610) on 10/5/00.  HT 274.  On 11/13/01, acquisition # 57609 was recorded as a disposition to

Briggs Gun Shop.  HT 275.  Mr. Horsley testified that the disposition entry for acquisition

# 57610 was "simply missed . . . ."  HT 275-276.

Concerning the Stoeger shotgun, Inspector Rushing testified that his investigation revealed

that there was no Form 4473 on file for the sale of the Stoeger shotgun,[27] so that no disposition

entry was made in the A&D Record book (HT 128) because Red's makes entries in the A&D

Book based upon information from the Form 4473.  Further, Inspector Rushing determined that

the Stoeger shotgun had been acquired by Dr. Pete Lister (a retired doctor).  HT 129-130.  Dr.

Lister:

> had the habit of grabbing every piece of document relating to a transfer of a firearm
> to him, he would take it with him or attempt to take it all with him out of the
> premises.  And Mr. Horsley stated that he thought that that's what happened in this
> case, that Mr. Lister took that transaction record with him.

HT 128-129.

Mr. Horsley clarified, without contradiction, that it was not Dr. Lister's practice to

take the Form 4473 out of the store, only to take "the manuals and other information that

the manufacturers would put in the box" and to leave the box.  HT 254-255.  In all Red's

"prior dealings with Dr. Lister," "when he took all the paperwork," he had never taken a

Form 4473 before."  HT 277.  At the Administrative Hearing, Mr. Horsley testified that

Red's "attempted to contact his wife, Alma Lister, several times and kept stating that we

---

[27] This violation is addressed in Count X, *infra*.

needed that - - we needed that form and she had argued and fought with us back and forth

. . . ." AR 245.  Red's made "every effort to try and obtain that form."  AR 245-246.  Mr.

Horsley explained that, although the Form 4473 had not been retained by Red's, it was not

because Red's was "intentionally or purposely disregarding the law" or because Red's

"simply did not care about what its legal obligations were."  HT 343.

As to the Savage rifle, this was the rifle that was special ordered for, and transferred to,

Randall Adams.  *See* Count II, *supra*.  Because Red's makes entries in the A&D Book based upon

information from the Form 4473, no disposition was entered into the A&D Book because Red's

did not have the Form 4473.

In light of the above facts, Red's did not act willfully in failing to record the disposition of

five firearms because, under either the *Safeco or* the *Perri/Cucchiara* standards, there was no

reasonable demonstration of a plain indifference to a legal obligation.  Rather, the failures to

record the dispositions of five (5) firearms, particularly in light of the fact that Red's has some

2,000 transactions per year, were inadvertent, technical record-keeping errors which the

"willfully" standard intended to preclude as a basis for license revocation.  That Red's was able to

determine the disposition of each firearm from other records (which was confirmed by Inspector

Rushing's independent investigation) further demonstrates that Red's failure to record the

dispositions was not because Red's acted recklessly, or even with plain indifference to its legal

obligation.

Count IX:  Respondent decided that Red's willfully violated 18 U.S.C. § 923(g)(3)(A) and

27 C.F.R. § 478.126a in that, "on four occasions the Licensee failed to prepare a report of multiple

sales . . . ."

18 U.S.C. § 923(g)(3)(A) provides in pertinent part:

**PETITIONER'S POST-HEARING BRIEF - 32**

Each licensee shall prepare a report of multiple sales or other dispositions whenever the licensee sells or otherwise disposes of, at one time or during any <u>five consecutive business days</u>, two or more pistols, or revolvers, or any combination of pistols and revolvers totalling two or more, to an unlicensed person.[28]  (Emphasis added).

Mr. Horsley testified, without contradiction, that Red's is not open on Sundays.  HT 368.[29] The Government's evidence showed that the first sales to Mr. Mauldin occurred on 2/4/04, a Wednesday, and on 2/7/04, a Saturday (Gov't Ex. 22); that the second sales to Mr. Mauldin occurred on 12/4/04, a Saturday, and on 12/8/04, a Wednesday (Gov't Ex. 21); and that the third sales to Mr. Mauldin occurred on 2/4/05, a Friday, and on 2/9/05, a Wednesday (Gov't Ex. 23). The sales to Mr. Van Sickle occurred on 3/4/05, a Friday, and on 3/7/05, a Monday.

Thus, in three of the four instances, the second sale occurred during five consecutive calendar days, but not during five consecutive <u>business</u> days.  Accordingly, as to those three instances, Red's did not violate 18 U.S.C. § 923(g)(3)(A) and 27 C.F.R. § 478.126a.  Moreover, at the very least, as to those three instances, because the law is not a model of clarity and Red's could well have misapplied it in good faith, Red's conduct could not be considered willful, even under the *Perri/Cucchiara* standard.

Even if the statute applies, the Government has not proven, by a preponderance of the evidence, that Red's acted willfully.  Inspector Rushing's Report stated that, from May 31, 2002 to May 31, 2005, Red's had filed 88 multiple sale forms.  Gov't Ex. 9-7.  He also testified that the result of his investigation was that the 4 forms were overlooked.  HT 180.  Further, he stated (as to the sales to Mr. Van Sickle) that Mr. Van Sickle "appeared dismayed that it was missed.  Of course, Mrs. Horsley was very dismayed that it was missed at that time."  HT 180.  Inspector

---

[28] 27 C.F.R. § 478.126a simply repeats 18 U.S.C. § 923(g)(3)(A).

[29] At the Administrative Hearing, Inspector Rushing testified that Red's was not open on Sundays.  AR 217.

**PETITIONER'S POST-HEARING BRIEF - 33**

Rushing also testified that Red's "try[s] to train their employees to identify that [multiple sales when the sales are made at different times]." HT 181. Further, he explained that Mrs. Horsley "goes through the last several days' worth of transaction records and tries to identify those multiples sales." HT 181-182. These four, however, "slipped through the cracks." HT 182.

Mr. Horsley testified, without contradiction, that the store has "a procedure in place to try and catch these situations there are multiple sales." HT 221. He explained that, in 2005, "Terry was the only one to do the dispositions at that time because we only wanted one person logging them out and only one set of eyes on there and just to be consistent." HT 221. Further, he made Mr. Van Sickle "aware of the requirement to report multiple sales" and that Mr. Van Sickle "had an obligation to notify" Mr. Horsley or Mrs. Horsley about a multiple sale," but Mr. Van Sickle, on the one instance, failed to do so. HT 226. With respect to the sales involving Mr. Mauldin, the three multiple sales "slipped through the cracks," (HT 228) even though Red's had adopted a procedure concerning multiple sales after the 2000 inspection. HT 264. The practice that Red's adopted following the 2000 inspection was to limit disposition recording to only Terry. HT 264. Former employee (and currently a bank regulator for the Idaho Department of Finance; HT 289) Seth Ruther testified that multiple sales reporting was "something they took serious" (HT 294) and, if the same person came back five days later, he would notify Mrs. Horsley or Mr. Horsley. HT 294-295. Mr. Horsley also testified that Red's "had instructed our employees that we need to . . . keep an eye out on these and . . . really communicate so that we catch these." HT 344. He emphasized that, in the four instances where the multiple sale form was not filed, was "[a]bsolutely] not because Red's was "purposely or intentionally disregarding its legal obligations," or because Red's "simply didn't care about its legal obligations." HT 344.

Under the *Safeco* interpretation of "willfully," there was not a knowing or reckless

**PETITIONER'S POST-HEARING BRIEF - 34**

violation of a legal obligation, or under the *Perri/Cucchiara* standard, there was not a purposeful disregard of, or plain indifference to, a legal obligation.

Count X:   Respondent found that Red's willfully violated 18 U.S.C. § 922(m) and 27 C.F.R. § 478.129(b) in that, "on one occasion the Licensee failed to retain an ATF Form 4473 for the required 20 year period after a sale or other disposition . . . ." The firearm disposition to which reference is made is the sale of the Stoeger shotgun to Dr. Pete Lister.

The Government has not proven, by a preponderance of the evidence, that Red's acted willfully in failing to retain the Form 4473. Inspector Rushing testified that he determined that the Stoeger shotgun had been acquired by Dr. Pete Lister (a retired doctor). HT 129-130. Dr. Lister:

> had the habit of grabbing every piece of document relating to a transfer of a firearm to him, he would take it with him or attempt to take it all with him out of the premises. And Mr. Horsley stated that he thought that that's what happened in this case, that Mr. Lister took that transaction record with him.

HT 128-129.

Mr. Horsley clarified that it was not Dr. Lister's practice to take the Form 4473 out of the store, only to take "the manuals and other information that the manufacturers would put in the box" and to leave the box. HT 254-255. In all Red's "prior dealings with Dr. Lister," "when he took all the paperwork," he had never taken a Form 4473 before." HT 277. At the Administrative Hearing, Mr. Horsley testified that Red's "attempted to contact his wife, Alma Lister, several times and kept stating that we needed that - - we needed that form and she had argued and fought with us back and forth . . . ." AR 245. Red's made "every effort to try and obtain that form." AR 245-246. Mr. Horsley explained that, although the Form 4473 had not been retained by Red's, it was not because Red's was "intentionally or purposely disregarding the law" or because Red's "simply did not care about what its legal obligations were." HT 343.

**PETITIONER'S POST-HEARING BRIEF - 35**

## IV.  THE CASE MUST BE REMANDED IF THE COURT REVERSES
## ANY PART OF AGENCY'S DECISION

It is well-established that "an agency's action may not be upheld on grounds other than those relied on by the agency." *National Railroad Passenger Corporation v. Boston & Maine Corp.,* 503 U.S. 407, 420 (1992). *See also FPC v. Texaco Inc.,* 417 U.S. 380, 397 (1974)("an agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.' (Citation omitted).").  Accordingly, if the court reverses any part of Respondent's decision, the court must remand the matter to Respondent.

## V.  CONCLUSION

There were substantial issues about inventory control and record-keeping that came to light as a result of the 2000 inspection of Red's.  But Red's responded decisively to the ATF's concerns, such that an inspection of its business a year later revealed that, except for 2 omissions out of 1,400 Forms 4473, the problems which had come to light previously had been eliminated.

When Red's was next inspected, four years later, problems were found, but none that implicated anything other than record-keeping; no firearms were unaccounted for and none were transferred to a prohibited person.  It is upon the basis of that inspection that Respondent now seeks to end a three-generation Idaho business.  To that end, Respondent relies upon admitted oversights of regulatory requirements, but a greater number of the alleged errors related to the completion of the ATF's Form 4473, a document whose requirements does not always plainly reflect the carefully specified requirements of the Gun Control Act's regulations.

Red's in no way denigrates the importance of accurate record-keeping conforming to the requirements of the Gun Control Act and those regulations which it properly authorizes. However, that importance cannot turn the statutory requirement of "willful" violations of law as the prerequisite for the revocation of a federal license into what becomes, in practical application, a standard of strict liability that admits no latitude for human paperwork error. Red's has put all of the violations it is accused of having committed over the four years preceding the June 2005 inspection into context and perspective and believes that Respondent's finding that it was plainly indifferent to its legal obligations was unjustified as matter of law and requests that the court set aside the revocation.

DATED:  September _15_, 2008.

STOEL RIVES LLP

J. Walter Sinclair
Mark S. Geston
Richard E. Gardiner (*Pro Hac Vice*)

Attorneys for Petitioner

**PETITIONER'S POST-HEARING BRIEF - 37**

## CERTIFICATE OF SERVICE

I hereby certify that on September _15_, 2008, I served a copy of the **PETITIONER'S**

**POST-HEARING BRIEF** on CM/ECF Registered Participants as reflected on the Notice of

Electronic Filing as follows:

Deborah.ferguson@usdoj.gov

Mark S. Geston

**PETITIONER'S POST-HEARING BRIEF - 38**
Boise-215347.1 0037424- 00001Boise-215340.1 0037424-